**BIG HORN COUNTY ELECTRIC CO-OPERATIVE, INC., a Montana Corporation, Plaintiff,**

v.

**Denis ADAMS, Tax Commissioner of the Crow Tribe of Indians, Steve Stevens and unknown members of the Crow Public Utilities Commission and Honorable Ron Arneson, and Honorable Glen Birdinground, Defendants.**

No. CV 98–43–BLG–JDS.

United States District Court,
D. Montana,
Billings Division.

April 2, 1999.

James E. Torske, Torske Law Office, Hardin, MT, for Plaintiff.

Dale T. White, John Fredericks, III, Fredericks, Pelcyger, Hester & White, Louisville, CO, Majel Russell, Crow Tribal Legal Dept., Billings, MT, Michael L. Chiropolos, Fredericks, Pelcyger, Hester & White, LLC, Louisville, CO, for Defendants.

## ORDER

SHANSTROM, Chief Judge.

Pending before the Court are cross-motions for summary judgment.

### Background

In 1993 the Crow Tribe enacted a utility tax. The tax rate is 3%. The tax is assessed against the full fair market value of all utility property located on tribal or trust lands within the exterior boundaries of the Crow Indian Reservation, or on easements and rights-of-way across such lands.

Big Horn Electric Cooperative (hereafter Big Horn) is a Montana corporation engaged in the delivery of electric energy and services to its members and users in both Montana and Wyoming. Big Horn delivers electricity to approximately 3,800 customers; 1,700 customers, both tribal and non-tribal members, are within the exterior boundaries of the Crow Indian Reservation, 1,600 customers are in Montana outside the reservation, and approximately 500 customers are in Wyoming. From 1994 through 1997 Big Horn paid to the Crow Tribe, under protest, over $172,-000 in utility taxes.

The utility tax regulations also contain a provision, Section 219, which states:

The tax imposed by this Code shall be considered an embedded operating cost and may not be assessed to or passed on to any class of customers or users in a different manner than ad valorem taxes assessed by the State of Montana or its political subdivisions. Any attempt to charge Crow Tribal members or any other customers on tribal or trust lands a higher charge or fee because of this tax or to separately identify this tax on the customers bill shall be considered discrimination and shall be null and void.

Beginning in 1994, Big Horn passed the utility tax through to all of its Montana customers. The pass-through was calculated based on each customer's pro-rata share of Big Horn's total kilowatt hour usage in 1993. Big Horn's utility bills included a separate itemized charge labeled "Crow Utility Tax." Such itemization, apparently, caused quite a furor.

On May 9, 1994, the Crow Tribe brought an action in tribal court to enjoin Big Horn from passing the utility tax through to its consumers. Big Horn counterclaimed alleging (1) the Crow Tax Code impermissibly allows the tax commissioner to assess all of Big Horn's property within the exterior boundaries of the reservation and (2) the Crow Tribe lacks regulatory authority over Big Horn.

On appeal, the Crow Tribal Court of Appeals held:

1. Section 219, the anti-pass-through provision, is a lawful exercise of the Crow Tribe's inherent authority to regulate Big Horn's activities on the Crow Reservation and the tribal courts have subject matter jurisdiction of the dispute involving Section 219.

2. Big Horn violated Section 219 when it passed through the utility tax to its consumers on a dollar-for dollar basis.

3. Big Horn's counterclaims regarding the Tribe's ability to tax all utility property within the exterior boundaries of the reservation, including property located on non-Indian fee lands, should be dismissed without prejudice to allow Big Horn Electric to pursue and exhaust administrative remedies.

The Crow Tribal Court of Appeals determined that "this is not a dispute about the Crow Tribe's authority to tax the Co-op's property located on Indian trust lands or fee lands owned by Crow Tribal members, or easements and rights-of-way across those lands." This Court finds to the contrary, noting that Big Horn contends that its rights-of-way across tribal and trust lands are equivalent to fee lands owned by nonmembers and, as a result, the Crow

Tribe cannot tax Big Horn's property on such rights-of-way.

In addition to the tax and attendant regulations, the Crow Tribe also created a tribal public utilities commission in 1994. However, because the commission was not prepared to process rate applications and was not "fully functioning" at the time of oral argument the Crow Tribal Court of Appeals vacated the Tribal Court's findings related to the PUC.

Big Horn filed this action contending the Crow Tribe: (1) does not have the regulatory authority to tax Big Horn utility property on non-Indian fee land or its equivalent, (2) does not have the regulatory authority to prohibit pass-through of the utility tax, and (2) does not have the authority to regulate Big Horn through the Crow Tribe Public Utility Commission. Big Horn seeks injunctive and declaratory relief as well as a refund of taxes paid. While the defendants pled three counterclaims, they are nothing more than requests that the plaintiff's claims be denied and are not true counterclaims because they seek no affirmative relief.

### Discussion

#### 1. The Tribe's Ability to Tax Property on Non–Indian Fee Land or Its Equivalent

■ Before even engaging in a discussion of the Tribe's ability to tax, the Court must first determine whether the rights-of-way at issue are of a nature and quality to be equivalent to fee land.

The rights-of-way were granted under the authority of 25 U.S.C. § 323–328 which affords the Secretary of the Interior the power to grant rights-of-way over trust and tribal lands. There are, apparently, over 30 rights-of-way which have been granted. Plaintiff has attached copies of two right-of-way easements, one granted by the Crow Tribe and another granted by an individual tribal member. The right-of-way easements are on government forms. The operative granting language reads "the Grantor ... does hereby convey ...

an EASEMENT for a right-of-way for rural electric distribution line purposes without limitation...." The easement is described as a 20–foot right-of-way, 10 feet on each side of a specifically described line.

In *Burlington Northern v. Estate of Red Wolf,* CV 96–17–BLG–JDS, this Court, quoting *Strate v. A–1 Contractors,* determined that the railroad right-of-way was equivalent to fee land owned by a nonmember because the Tribe retained no gatekeeping right and could not assert a landowner's right to occupy and exclude. Big Horn argues that the same analysis should apply to the rights-of-way at issue in this case and that for tribal jurisdictional purposes the rights-of-way should be equivalent to fee land owned by nonmembers. The tribal defendants contend the instant rights-of-way are different from the highway right-of-way in *Strate* for several reasons. First, they argue the utility lines are not open to the general public like a highway. Second, the federal regulations afford the Department of the Interior more control over the utility rights-of-way. Third, the rights-of-way were not granted in perpetuity but instead limited by federal regulations to 50 years. Finally, neither the State of Montana nor any county or local government regulates all activities within the utility rights-of-way.

While the rights-of-way are not open to the public, use of the rights-of-way is subject to Big Horn's control. Neither the Crow Tribe nor the individual members have retained a gatekeeping right. As in *Strate,* so long as the rights-of-way are maintained as part of Big Horn's electric distribution system, neither the Tribe nor the individual tribal landowners can assert a landowner's right to occupy the right-of-way and exclude others. There is no material difference between the rights-of-way in this case and the railroad right-of-way in *Red Wolf.* Thus, for purposes of the exercise of tribal civil authority, the rights-of-way at issue in this case are equivalent to fee land. Having so determined, the Court must next determine to what extent,

if any, the Tribe can regulate Big Horn's activities or conduct on the equivalent of nonmember fee land.

 Absent express authorization by federal statute or treaty, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land, or its equivalent, within the exterior boundaries of a reservation. *See Strate v. A–1 Contractors,* 520 U.S. 438, 117 S.Ct. 1404, 1409, 137 L.Ed.2d 661 (1997); *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 1257–1258, 67 L.Ed.2d 493 (1981). The tribal defendants concede that there is no express federal statute or treaty which permits the Tribe to regulate the on-reservation activities of Big Horn. However,

> [I]ndian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservation, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. [citations omitted] A tribe may also retain power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. (emphasis added)

Montana, 450 U.S. 544, 101 S.Ct. at 1258.

The Crow Tribal Court of Appeals determined that a consensual relationship exists between Big Horn and the Tribe based upon: (1) the 30 right-of-way agreements between Big Horn and the Tribe or its members, (2) easements across tribal and individual trust lands to serve tribal members' homes, and (3) membership agreements between Big Horn and the Tribe and its members for electrical service.

In their motion, the tribal defendants argue that this is a classic *quid pro quo* involving the sale of electrical service to the Tribe and its members under membership agreements with Big Horn County Electric Cooperative. Defendants claim the sale of power by Big Horn to the Crow Tribe and its members is a textbook example of what the *Montana* Court described as a consensual relationship between a nonmember and the Tribe. The Court notes, however, that the Tribe does not tax the sale of power.

Big Horn contends that no qualifying consensual relationship exists for the following reasons. The Co-op first argues that the utility rights-of-way alone cannot create a consensual relationship because federal law requires it to obtain rights-of-way and also provides the statutory mechanism to acquire such rights-of-way. Moreover, the rights-of-way are equivalent to fee land. Second, Big Horn contends the membership agreements cannot form the basis for a consensual relationship because once Big Horn undertook the task of bringing electric service to rural areas, neither reservation boundaries, state lines, nor demography are taken into consideration in the delivery of electricity. Under federal law, Big Horn must deliver electric service in a non-discriminatory manner. Third, under the Montana Rural Electric and Telephone Cooperative Act, Big Horn's legal obligation to its members is not to seek commercial benefit, but rather is instead to return all excess revenue to its members.

*Montana* defines consensual relationships with the tribe or its members as "commercial dealing, contracts, leases, or other arrangements." *Id.* Big Horn voluntarily undertook to set up an electricity distribution network, in part, on the Crow Indian Reservation. Big Horn delivers electricity to the Crow Tribe and its members and it charges a fee for that delivery. Big Horn's activities constitute a "consensual relationship" as defined by *Montana.*

The existence of a consensual relationship therefore allows the Tribe to use its retained inherent sovereign power and exercise civil jurisdiction and authority over

the "activities" or "conduct" of Big Horn County Electric Co-op, even on non-Indian fee land.

■ Next, the Court must determine whether an ad *valorem tax* on the Co-op's "utility property", located on what this Court has determined is the equivalent of nonmember fee land, is a legitimate exercise of the Tribe's sovereign power to impose a tax on the "activities" or "conduct" of the Co-op which form the basis of the consensual relationship.

■ There is no question that taxes are a permissible form of tribal civil regulatory authority. *See Morris v. Hitchcock,* 194 U.S. 384, 24 S.Ct. 712, 48 L.Ed. 1030 (1904) (upholding tribal permit tax on non-member-owned livestock grazing on Indian land under contracts with individual members of the Tribe); *Buster v. Wright,* 135 F. 947 (8th Cir.1905) (upholding tribal permit tax for privilege of conducting business within Tribe's borders); *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) (upholding tribal authority to tax cigarette sales to nonmembers occurring on trust lands); *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (upholding tribal severance tax on oil and gas production on tribal land).

However, the existence of a consensual relationship does not give the Tribe the power to tax, carte blanche, the activities or conduct of nonmembers on the equivalent of fee land. To the contrary, in commenting upon the early tribal tax cases of *Morris* and *Buster,* the *Jicarilla* Court noted that "these cases demonstrate that a tribe has the power to tax nonmembers only to the extent the nonmember enjoys the privilege of trade or other activity on the reservation to which the tribe can attach a tax." *Jicarilla,* 455 U.S. at 142, 102 S.Ct. 894. *Jicarilla* followed this precedent by upholding a tax on the act of severing oil and gas from tribal and trust lands, even though the lands were leased

by a nonmember. Here, the ad valorem tax, by its nature, is not a tax on conduct, activity, or trade. It is a tax on property which, in part in this case, is located on the equivalent of nonmember fee land. Such a tax, even in light of the consensual relationship between Big Horn and the Tribe, exceeds the inherent sovereign authority of the Tribe because it is not a tax on conduct, activity, or trade as required by *Montana, Jicarilla, Morris,* and *Washington v. Confederated Tribes of the Colville Indian Reservation.*

**2. The Tribe's Ability to Prohibit Pass-Through of the Tax**

The Crow Tribal Court of Appeals determined that Big Horn violated section 219, the anti-pass-through provision, because (1) its attempt at passing the tax through to its customers was not based upon any financial justification and (2) it did not treat the tribal utility tax the way it treated other cost increases. However, because the Court has determined that the ad valorem tax at issue is invalid, the Court need not address the issue of the validity of the anti-pass through provision.

**3. The Regulatory Authority of the Tribal PUC**

■ The Crow Tribe has created a public utilities commission. However, the defendants argue that this claim is not ripe for review because the Tribe has not enacted any rules or regulations nor has the PUC attempted to impose any utilities regulations on Big Horn Electric or any other utility.

■ The ripeness doctrine prevents "the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Federal courts normally ought not resolve issues involving contingent future events that may not occur as anticipated or that may not occur at all. *Thomas v. Union Carbide Agricultural Products Co.,* 473

U.S. 568, 580–581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985). Ripeness requires the court to evaluate (1) whether the issues are fit for judicial decision and (2) whether the parties will suffer hardship if the court declines to consider the issues. *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. 1507.

The issue of the regulatory authority of the Tribal PUC is not ripe for review because the Tribe has not enacted any rules or regulations under which the PUC operates. Any adjudication of the of the validity of the PUC involves resolving issues related to contingent future events that may not occur as anticipated or that may not occur at all.

Based upon the foregoing,

**IT IS HEREBY ORDERED** that the parties' cross motions are granted in part and denied in part as set forth above.

**IT IS FURTHER ORDERED** that the defendants and their successors are permanently enjoined from assessing the *ad valorem* Tribal Utility Tax, Title XIII of the Crow Tribal Code, against plaintiff Big Horn County Electric Co-op's property, where such property is located on non-member fee land or its equivalent, including the rights-of-way over tribal land.

**IT IS FINALLY ORDERED** that defendants shall refund to plaintiff all utility taxes paid. Within 10 days from the date of this Order plaintiff shall file documentation (affidavits, statements, canceled checks) which details the amount of utility tax it has paid to the Crow Tribe. If defendants contest the amount of utility tax allegedly paid, defendants shall file their documentation opposing such claim within 10 days of receipt of plaintiff's material.

The Clerk shall forthwith notify the parties of the making of this Order.